IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

JACKIE C. MADDEN          )
                          )
v.                        )     No. 2:05-0118
                          )     Judge Nixon/Bryant
MICHAEL J. ASTRUE, Commissioner of )
Social Security[1]        )


To:  The Honorable John T. Nixon, Senior Judge


### REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§
405(g) and 1383(c)(3), to obtain judicial review of the final
decision of the Commissioner of Social Security denying plaintiff
disability insurance benefits ("DIB") and supplemental security
income ("SSI"), as provided under Titles II and XVI of the Social
Security Act ("the Act"), as amended.  The case is currently
pending on plaintiff's motion for judgment on the administrative
record (Docket Entry No. 16), to which defendant has responded
(Docket Entry No. 22).  Plaintiff has further filed a reply to
plaintiff's response (Docket Entry No. 23).  For the reasons
stated below, the Magistrate Judge recommends that plaintiff's
motion for judgment on the administrative record be GRANTED, and
that the decision of the Commissioner be REVERSED and the cause

---

[1]Michael J. Astrue replaced Jo Anne B. Barnhart as the Commissioner of
Social Security on February 12, 2007, and is "automatically substituted" as
party defendant in this case, pursuant to Fed.R.Civ.P. 25(d)(1).

1

REMANDED for further administrative proceedings consistent with this report.

## I.  PROCEDURAL HISTORY

Plaintiff filed his DIB and SSI applications on March 17, 2003, and February 24, 2003, respectively (Tr. 60-62, 429-32).  He alleged disability onset as of July 3, 2001 (which he later amended to August 30, 2003, Tr. 124), due to avascular necrosis[2] (AVN) and chronic obstructive pulmonary disease. Following denials at the initial (Tr. 40-43, 435-38) and reconsideration (Tr. 49-52, 441-42) levels of agency review, plaintiff filed a request for hearing before an Administrative Law Judge (ALJ).  After a continuance of the hearing for purposes of allowing plaintiff to secure representation (Tr. 451-56), plaintiff appeared before the ALJ, with counsel, on May 27, 2005 (Tr. 457-85).  Plaintiff, his wife, and an impartial vocational expert (VE) testified at the hearing.  At the conclusion of the hearing, the ALJ took the case under advisement.

On July 25, 2005, the ALJ issued a written decision in which he found plaintiff not disabled (Tr. 11-20).  The ALJ made the following enumerated findings:

1.  The insured status requirements of the Act were met as of the alleged onset date.

---

[2]Avascular necrosis is, essentially, bone death due to deficient blood supply.  See Dorland's Illustrated Medical Dictionary 1103 (28th ed. 1994).

2

2. No substantial gainful activity has been performed since the alleged onset date.

3. The claimant has "severe" impairments including: status-post bilateral hip replacement due to avascular necrosis and chronic obstructive pulmonary disease.

4. No impairment or combination thereof meets or equals the disability requirements of an impairment listed at Appendix 1, Subpart P, 20 CFR Part 404.

5. The subjective allegations of disability are not credible.

6. The claimant retains the residual functional capacity for a limited range of light work as described in the body of the decision.

7. The residual functional capacity precludes all past relevant work.

8. The claimant is a "younger" individual.

9. The claimant has a "limited" education.

10. The claimant has no transferable work skills.

11. Using Rule 202.18 as a framework for decision making, a "significant number" of jobs exist in the national economy which could be performed, considering the residual functional capacity and vocational factors. Examples of such jobs include: light production assembler and machine operator, and sedentary assembler, inspector, and general laborer.

12. The claimant has not been under a disability through the date of this decision.

(Tr. 19-20)

       On October 17, 2005, the Appeals Council denied

plaintiff's request for review of the decision of the ALJ (Tr. 6-

9), thereby rendering that decision the final decision of the

Commissioner. This civil action was thereafter timely filed, and

the Court has jurisdiction.  42 U.S.C. §§ 405(g), 1383(c).  If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive.  Id.

## II.  REVIEW OF THE RECORD[3]

### A.  Medical Evidence

Plaintiff presented to Robert Fogolin, M.D., an orthopedic specialist, on February 21, 2003, complaining of bilateral hip pain with radiculopathy, left greater than right, and left knee pain (Tr. 127).  Examination of plaintiff's left hip revealed tenderness with range-of-motion, while no tenderness was reported in the right hip (Tr. 128).  Examination of the left knee revealed no effusion, edema, or tenderness to palpation. Id.  Dr. Fogolin reviewed MRI scans of plaintiff's left thigh[4] and knee, as well as x-rays plaintiff had already undergone, but because he felt there was a discrepancy between the MRI and x-rays in terms of the damage to the left hip, he ordered x-rays of both hips, which revealed no evidence of AVN (Tr. 128-130).  This appears to be plaintiff's only visit to Dr. Fogolin.

---

[3]This record review is taken almost entirely from plaintiff's brief (Docket Entry No. 16 at 4-12).

[4]Presumably, Dr. Fogolin was referring to the MRI performed on February 13, 2003, which revealed bilateral femur head avascular necrosis, more advanced on the left (Tr. 212, 371).  An MRI of the left knee was negative (Tr. 372).

4

A few days later, plaintiff was seen by Matloob Khan, an orthopedic surgeon (Tr. 157-158).  Dr. Khan reported that plaintiff complained of bilateral hip and knee pain of some four months' duration, and he noted the results from the earlier MRI, which had revealed "bilateral avascular necrosis far more advanced on the left than on the right" (Tr. 158).  Dr. Khan observed plaintiff walking with a limp, and his examination revealed that plaintiff was in moderately severe pain, with full range of motion in the hip (which one is not clear), but pain with rotation.  Id.  Dr. Khan thought plaintiff would eventually require a total hip replacement and advised him to change his job, maybe to a sitting one, and indicated he might have to use crutches on and off.  Id.

On June 28, 2003, plaintiff presented to Macon County General Hospital complaining of left hip pain (rated at 9 on a scale from 1-10), which he attributed to an injury he sustained in getting out of his truck (Tr. 144).  Plaintiff informed hospital personnel that he had "dying hips [with decreasing] blood flow [and] chronic pain."  Id.  An x-ray of the left hip was ordered, which revealed degenerative changes, peripheral osteophyte formation, subchondral irregularities, and mixed density in the left femoral head suggestive of previous trauma and/or avascular necrosis (Tr. 145).  The diagnosis was degenerative left femoral head/acetabulum (Tr. 141).

An MRI of the pelvis performed at Sumner Regional Medical Center on July 1, 2003, revealed marked osteonecrosis of the left femoral head and mild osteonecrosis of the right femoral head; left hip joint effusion was also reported (Tr. 207, 370). X-rays of the pelvis and hips on the same date revealed marked degenerative changes in the left hip, as well as subchondral cystic changes (Tr. 208, 369).

Plaintiff's primary care physician, Robert Ladd, D.O., referred him to another orthopedic specialist, Roy Terry, M.D., in July 2003 (Tr. 169). Dr. Terry examined plaintiff on August 14, 2003 (Tr. 160-161). His detailed note of that date reflects a history of "really, really bad" bilateral hip pain, left greater than right (Tr. 160). Dr. Terry reviewed the prior diagnostic studies, disagreeing with the interpretation of earlier x-rays, stating: "[I]t is notable the patient on review of these radiographs myself has what appears to be collapse and a fracture of the femoral head on the left as opposed to any osteoarthritis. There is evidence of some changes on the right hip." Id. Dr. Terry's examination revealed no neurological or pulse deficits in either hip, but he reported limited and painful range-of-motion in the left hip, both to internal and external rotation. Id. He noted no limitation in the right hip. Id. Straight-leg raising while sitting was negative bilaterally and no pulse or strength deficits were present, although plaintiff's

6

hip (presumably, the left one) was painful. <u>Id.</u> Dr. Terry had a long discussion with plaintiff about plaintiff's use of alcohol (he had a history of past alcohol abuse and a DUI in 1994), and he explained the available options. <u>Id.</u> Dr. Terry thought it "very reasonable" for plaintiff to consider a left hip replacement (Tr. 161).

On November 3, 2003, plaintiff underwent a total left hip replacement at University Medical Center, which Dr. Terry performed (Tr. 237-241). Both the pre- and post-operative diagnoses were osteonecrosis of the left hip with secondary osteoarthritis (Tr. 237). On November 11, 2003, plaintiff was seen at the hospital complaining of severe left hip pain (Tr. 294). On November 18, 2003, he reported to Dr. Terry that he was "continuing to have a lot of pain." (Tr. 423). By December 2, 2003, he was "doing pretty well until he sort of stumbled the other day and had some more pain in his hip." (Tr. 422). During these last two visits, Dr. Terry appeared to be a bit annoyed that plaintiff wasn't getting the physical therapy he ordered[5] and stopped giving him narcotic medication (Tr. 421-422). Plaintiff appears to have last seen Dr. Terry on January 13, 2004, when he reported he was not sleeping well (Tr. 420). Dr. Terry noted plaintiff was walking with a cane, weight-bearing as

_____

[5]Plaintiff said he was home, where the therapy was to be performed, while the home-health care therapist reported he was not there (Tr. 422). However, the record reflects plaintiff was seen in physical therapy on at least 12 occasions following this surgery (Tr. 400).

7

tolerated, and that the left hip implant showed no evidence of loosening.  Id.

An x-ray of plaintiff's right hip performed on November 17, 2004, revealed mild degenerative changes (Tr. 267, 273, 367). An MRI of the hips less than a month later, however, revealed "[f]indings compatible with avascular necrosis in the right femur head." (Tr. 268, 366, 419).  On January 7, 2005, plaintiff was referred to John Bacon, M.D., an orthopedic surgeon (Tr. 409). Dr. Bacon's history noted plaintiff's long history of progressive right hip pain (Tr. 349).  Because this pain had become intractable, Dr. Bacon performed a total right hip replacement on January 25, 2005 (Tr. 351-352).  Dr. Bacon continued to see plaintiff through April 26, 2005, but his notes are largely cryptic, although it appears he was satisfied with the position of the hip replacement (Tr. 407-409).  Following the surgery, plaintiff again underwent a regimen of physical therapy (Tr. 411-416).

On February 8, 2005, emergency medical technicians were dispatched to plaintiff's home, where he complained of severe chest pain and right leg cramps, and he was transported to the hospital (Tr. 279-80).  Plaintiff was admitted to the hospital, was treated with intravenous medications, and was discharged home the next day when his condition had improved (Tr. 275-78).

Regarding plaintiff's pulmonary impairment, chest x-

8

rays on May 7, 2002, revealed pleural parenchymal changes on the right hemithorax thought to be related to scarring and COPD (Tr. 375). X-rays on March 4, 2004, revealed fibrotic changes in the right lower lung field (Tr. 346, 396). X-rays on March 9, 2005, revealed a similar finding in both lung fields, albeit more prominent on the right side (Tr. 363). X-rays on March 25, 2005, revealed chronic basilar fibrosis (Tr. 387).

Robert Ladd, D.O., has been plaintiff's primary care physician since at least February 6, 2002 (Tr. 205, 234), and made referrals to specialists for treatment of plaintiff's orthopedic impairments (Tr. 169, 179, 181). Dr. Ladd treated plaintiff for a number of medical problems, many of which were minor and temporary, and not relevant here. His treatment notes, however, reflect plaintiff's complaints of hip pain on numerous occasions (Tr. 164, 167-168, 171, 175, 188, 303-304, 306-307, 309, 317-319, 321). Dr. Ladd completed a medical source statement on February 28, 2005 (slightly more than a month after plaintiff's second hip replacement), indicating plaintiff could lift/carry less than 10 pounds occasionally or frequently; stand and/or walk less than 2 hours per 8-hour workday, and would need to periodically alternate sitting[6] and standing to relieve pain or discomfort (Tr. 299-300). He also indicated plaintiff was

---

[6]Dr. Ladd indicated sitting was affected by plaintiff's impairment, but he did not specify how long plaintiff could sit in an 8-hour workday (Tr. 300).

limited in his ability to push or pull with his lower extremities
(Tr. 300). Finally, Dr. Ladd opined that plaintiff could never
climb, kneel, crouch, or stoop and only occasionally balance or
crawl. Id.

Dr. George Bounds, a nontreating, nonexamining state-
agency medical consultant opined on June 19, 2003 (five months
before plaintiff's first hip replacement), that plaintiff could
lift 20 pounds occasionally and 10 pounds frequently, stand
and/or walk 2 hours per 8-hour workday, and sit about 6 hours per
8-hour workday (Tr. 133, 139). He further opined that plaintiff
was limited to only occasional climbing, balancing, stooping,
kneeling, crouching, crawling, and pushing and pulling with his
lower extremities (Tr. 133).

B. Testimonial Evidence

Plaintiff's Testimony

Plaintiff was born on July 30, 1958 (Tr. 460) and was
educated through the ninth grade; he never received a GED (Tr.
461). He had a commercial drivers license and drove an
automobile if he had to. Id. He testified he had no current
problems with alcohol, street drugs, or prescription medications,
but had struggled with alcohol abuse in the mid-1990s and had
received a DUI around 1994 (Tr. 462). He said he had last worked
in 2003 but didn't "really know the date." (Tr. 463) He said
getting records from his employer was the only way he could

10

ascertain when he last worked (Tr. 464). When the ALJ continued to press plaintiff as to the date he last worked, plaintiff stated: "Sir, I would be lying to you if I said either way because I don't, I would have to get the check stub. I would have to get in touch with Bennett [plaintiff's employer] and get a stub to know the exact date but I don't want to say it." (Tr. 465)

Plaintiff testified that in his job as a tractor-trailer truck driver hauling mobile homes, he experienced pain in his hip and legs (Tr. 467) to the extent that after 50 to 100 miles, he would have to stop and pull in a truck stop or rest area, where he would have to remain for anywhere from 30 minutes to the rest of the day, depending on how bad he was hurting (Tr. 466). He testified it took him 2 days to make a 1-day run and up to a week to make a 3-day run (Tr. 467). He said he sometimes couldn't walk. Id. His past work required him to climb into whatever equipment he was operating, and he said the equipment "beats you to death." Id. Plaintiff testified his hips had been bothering him two years before he "finally had to get something done to it and that even made it worse." Id. He had his left hip replaced first, in November 2003, because it was in worse shape (Tr. 468). His right hip was replaced in January 2005.

11

Id. Following each surgery, he was on a walker[7], but had progressed to a cane following the first hip replacement. Id. Four months after the second hip replacement, plaintiff testified his right hip was worse and that he "wished [he] really hadn't had it done." (Tr. 469) He required the use of a walker to ambulate, even in his house. Id. He said he could sit between 15-25 minutes before the discomfort caused him to change positions. Id. He said he could stand about 1-2 minutes without anything to hold onto and between 5-15 minutes with his walker (Tr. 470). Plaintiff testified he could not stoop, i.e., bend from the waist, and that his wife did "most of [his] shoe tying." Id.

Plaintiff testified he wore a Duragesic pain patch and took prescription pain medication to alleviate his pain, as well as using a heating pad (Tr. 471-472). He said he had to change positions, e.g., from sitting upright to reclining, after a few minutes to alleviate the throbbing and burning he experienced (Tr. 472). He stated: "It's just a tossing and moving all the time, more or less. I can't sit still or stand any length of time." Id. When asked to compare his condition at the time of the hearing to his condition when he quit working, plaintiff testified he was worse now ("I am worse with the pain") and

---

[7]At plaintiff's hearing, which was four months after his second hip replacement, he was still on a walker (Tr. 468). After the first surgery, he required a walker to ambulate for no more than two months (Tr. 471).

12

couldn't move around like he used to.  Id.  Before he had either hip replaced, he said he hurt, "but it wasn't like this."  Id.

With respect to his breathing problem, plaintiff testified he had been using a home nebulizer unit, prescribed by Dr. Ladd, for about a year and also used inhalers (Tr. 474).  He said his breathing got shallow and these devices kept him "kind of opened up."  (Tr. 474-475)  He admitted he still smoked, albeit about one-third of what he used to, and that his doctor had told him to quit smoking 20 years ago (Tr. 474).

## Vocational Expert Testimony

VE Rebecca Williams classified plaintiff's past work as a heavy equipment operator as medium and skilled, and as a tractor-trailer truck driver medium and semiskilled (Tr. 465-466).  Plaintiff did not dispute these classifications (Tr. 466). The ALJ asked the VE two hypothetical questions.  In the first, he asked the VE to assume an individual between 44 and 46 years of age with plaintiff's work background and a 9th-grade education who could read, write, add, and subtract, and who could operate an automobile; who could lift 20 pounds occasionally and 10 pounds frequently; who could stand and walk 2 hours in an 8-hour workday and sit for 6 hours in an 8-hour workday; and who could not routinely use foot controls, and could only occasionally climb, balance, stoop, kneel, crouch, and crawl (Tr. 476-477). The VE testified such an individual would have a residual

13

functional capacity for a limited range of light work and would not be able to perform plaintiff's past work (Tr. 477). The VE identified the following light jobs available to such an individual: production assembler (somewhere around 800 jobs in the state) and machine operator (about 1,000) (Tr. 478). At the sedentary exertional level, the VE identified the following jobs available to such an individual: assemblers (about 5,200), inspectors (700), and general laborers (about 1,300). Id.

In the second hypothetical, the ALJ asked the VE to assume an individual with the background described above, but who could lift less than 10 pounds on an occasional and frequent basis; who could stand and walk less than 2 hours in an 8-hour workday; who would require a sit/stand at-will option to complete a 7-1/2 or 8-hour work shift; and who had no functional ability with regard to use of the lower extremities; and who could only occasionally balance or crawl, and never climb, kneel, crouch, and stoop (Tr. 478). The VE testified such an individual would not be able to perform the light jobs she described in the preceding hypothetical but could perform the sedentary jobs she identified (Tr. 479). On cross-examination, the VE admitted these sedentary jobs were production jobs performed in a factory setting that involved continuous work processes with little opportunity for diversion or interruption. Id. The VE testified that pain at the moderately severe level or higher precluded

14

performance of all the jobs she identified (Tr. 480).

The VE was asked about the impact of having to hold onto something when standing, while exercising the sit/stand option. <u>Id.</u> She testified that if an individual were required to hold onto something while standing, he would be unable to perform the jobs she identified. <u>Id.</u> Then VE was then asked: "So really a sit/stand option for an individual with the need to use both hands to support himself while standing is not really a sit/stand option at all, is it?" <u>Id.</u> The VE responded in the negative. <u>Id.</u>

## III.  CONCLUSIONS OF LAW

### A.  <u>Standard of Review</u>

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. <u>Jones v. Sec'y of Health & Human Servs.</u>, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  <u>Landsaw v. Sec'y of Health & Human Servs.</u>, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the

conclusion." <u>Her v. Comm'r of Soc. Sec.</u>, 203 F.3d 388, 389 (6th Cir. 1999)(<u>citing</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)).  It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."  <u>Bell v. Comm'r of Soc. Sec.</u>, 105 F.3d 244, 245 (6th Cir. 1996).  Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached.  <u>Her</u>, 203 F.3d at 389 (<u>citing</u> <u>Key v. Callahan</u>, 109 F.3d 270, 273 (6th Cir. 1997)).  However, if the record was not considered as a whole, the Commissioner's conclusion is undermined.  <u>Hurst v. Sec'y of Health & Human Servs.</u>, 753 F.2d 517, 519 (6th Cir. 1985).

      B.  <u>Proceedings at the Administrative Level</u>

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process, as follows:

(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
(2)  If the claimant is not found to have an impairment which

16

significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[8] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

(4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a <u>prima facie</u> case of disability.

(5) Once the claimant establishes a <u>prima facie</u> case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

<u>Moon v. Sullivan</u>, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. <u>Id.</u> In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the

---

[8]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

17

claimant's <u>prima</u> <u>facie</u> case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. See <u>Varley v. Sec'y of Health & Human Servs.</u>, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. § 423(d)(2)(B); <u>Foster v. Bowen</u>, 853 F.2d 483, 490 (6th Cir. 1988).

C. <u>Plaintiff's Statement of Errors</u>

Plaintiff alleges error in the ALJ's evaluation of his credibility, as well as the ALJ's failure to consider the vocational impact of his need to use a walker or cane while standing. As explained below, the undersigned concludes that the reasons identified by the ALJ in support of his disbelief of plaintiff's subjective allegations, including his implicit disbelief of plaintiff's professed need for support while standing, are insufficient bases upon which to rest the finding of nondisability in this case.

As plaintiff first points out in his brief, the ALJ appears to have been unaware that plaintiff amended his alleged onset date in this case. Plaintiff had originally alleged the

18

onset of disability as of February 1, 2003 (Tr. 60), some nine months prior to the first of his two hip replacement surgeries. At the May 2005 hearing, under examination by the ALJ, plaintiff testified that he could not remember exactly when in 2003 he stopped working, but that his pay records would show the correct date of his last employment (Tr. 463-65). Those records were subsequently found to reflect a date last employed of August 26, 2003, prompting plaintiff to amend his alleged disability onset date to August 30, 2003, by letter dated May 28, 2005 (Tr. 124). This letter was stamped received in the office of the ALJ on May 31, 2005. (Id.) However, there is no mention of this amendment to the alleged onset date in the ALJ's opinion entered July 25, 2005.

In arriving at his determination that plaintiff's testimony is not worthy of full credence, the ALJ relied in no small measure on plaintiff's equivocation as to his date last employed. The following paragraphs of the ALJ's decision deal with the perceived inconsistencies in plaintiff's reported limitations versus his activities reflected in the record:

> A Physical Therapy Evaluation was performed in December 2003 (about one month post-left total hip replacement). Physical therapist Chad Alderson reported that the claimant was "**self-employed/sub contractor pulling mobile homes**." That is interesting despite the fact that he alleged an onset date of disability of February 2003. This supports the suspicion that he continued working well beyond the alleged onset date, and helps explain his inability to *recall the date that he last worked*. Mr. Alderson went on to report that the

19

claimant "**performs various amounts of strenuous activity**" and "He also shifts gears thus presses the clutch of his truck."  Reasonably expected the claimant was weak, stiff and experiencing some pain after surgery, with his left leg limiting activities of daily living, mobility, and self-care.  Exhibit 15F.

* * *

Medical evidence shows that in February 2005, the claimant presented to University Medical Center with pain in his left hip.  The medical professional reported that despite alleged severe pain the claimant was able to "**ambulate independently, and can perform all activities of daily living without assistance.**" Exhibit 12F.

The hearing testimony and documentary record are inconsistent with the medical evidence of record.  At the hearing, the claimant was not able to recall the date he last worked.  The evidence shows that he worked in June 2003, he admitted to working in August 2003, and he continued to work as of December 2003 as a self-employed contractor, which involved physically strenuous activities.  Even though doctors told him to quit smoking 20 years ago, he continues to smoke, and therefore, is non-compliant.  Furthermore, medical professionals reported that the claimant was able to ambulate independently and perform all activities of daily living as of February 2005.  The subjective allegations of disability are not credible when they are examined under the guidelines set forth in the Social Security Regulations at 20 CFR 404.1529. Consequently, the claimant's witness' testimony was not fully credible.

(Tr. 16-18)(emphasis in original)

The ALJ's credibility finding is due great deference, particularly since he had the opportunity to observe plaintiff's demeanor while testifying.  Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003).  Thus, the court is limited to evaluating whether or not the ALJ's reasons for discrediting

20

plaintiff are reasonable and supported by substantial evidence in the record.  Id.  Respectfully, the undersigned must conclude that the ALJ unreasonably relied upon the items cited above in discrediting plaintiff's allegations.[9]

Plaintiff had his left hip joint surgically replaced on November 5, 2003 (Tr. 237-39).  On referral from Dr. Terry, physical therapist Chad Alderson evaluated plaintiff on December 18, 2003 (Tr. 404-05).  Mr. Alderson began his note of this evaluation by reciting plaintiff's history, including his work history.  In so doing, Mr. Alderson used the present tense in describing plaintiff's employment status and the physical requirements of plaintiff's occupation.  (Tr. 404 ("Patient is a 45 year old white male, self-employed/sub contractor pulling mobile homes.  Performs various amounts of strenuous activity according to the trailers or road conditions.  He also shifts gears thus presses the clutch on his truck."))  The ALJ seized on this language as indicating that plaintiff was in fact working and performing strenuous job duties at the time of the evaluation in December 2003, roughly one month after his total left hip replacement.  However, in addition to the extreme unlikelihood of so speedy a recovery from surgery, the ALJ's interpretation of the therapist's language is belied by the remainder of his

---

[9]The ALJ did not unreasonably rely on plaintiff's failure to comply with his physicians' recommendation to quit smoking, at least insofar as it pertains to the credibility of plaintiff's pulmonary complaints, and not his credibility in general.

21

evaluation report, wherein he stated that plaintiff:  had become
unable to drive his truck before seeing Dr. Terry; had been
discharged from surgery aftercare with instructions to progress
with weight bearing as tolerated, but was advised to stop weight
bearing with his left leg after returning to Dr. Terry on
December 4, 2003 with increased hip pain; was using crutches at
the time of the evaluation in order to avoid weight bearing on
the left leg; had moderate atrophy of the left gluteus maximus,
gluteus medius, and quadriceps muscles due to guarding his left
side while attempting to bear weight during ambulation; and, was
noted to be "painful, stiff, weak" in the left hip/leg, with
resulting limitations of activities of daily living, mobility,
and self care.  (Tr. 404-05)  Mr. Alderson defined plaintiff's
short term goals to include ambulating with a cane or other
assistive device without displaying "trendelenberg pattern,"[10]
and established the long term goal of returning to independent
activities of daily living without an assistive device and
without pain (Tr. 405).

       In short, it is clear that the ALJ erred in construing
the initial language of the therapist's report to establish
plaintiff's continued strenuous work activity in December 2003.
Plaintiff testified repeatedly at his hearing that he did not

_____

       [10]Trendelenburg's symptom is defined as "a waddling gait due to
paralysis of the gluteal muscles."  Dorland's Illustrated Medical Dictionary
1620, 1737 (28th ed. 1994).

22

remember the month in which he worked his last day, but would have to get his employer's pay records to refresh his recollection, and his brief equivocation when cross-examined on the issue by the ALJ (Tr. 463-65) would not alone appear to support the ALJ's suspicions about plaintiff's motives. In any event, plaintiff promptly amended his alleged onset date to conform with the documentation provided by his employer. The ALJ's failure to recognize this amendment resulted in undue focus being placed on plaintiff's condition prior to the first of his two hip surgeries, to the extent that the ALJ even adopted the RFC assessment of a nonexamining physician rendered in June 2003 (Tr. 18, 132-39), nearly five months before plaintiff's left hip replacement and before plaintiff even began to experience significant symptoms in his right hip.

The record reflects plaintiff's complaints of enduring limitations following his right total hip replacement in January 2005. However, the ALJ inexplicably credited a nurse's report that plaintiff could "ambulate independently, and can perform all activities of daily living without assistance" (Tr. 275), dated fifteen days after plaintiff's January 25, 2005 total right hip replacement, while giving "no weight" to the February 28, 2005 assessment of Dr. Ladd, plaintiff's treating physician, "because it was issued less than 1 month after the claimant's hip surgery" (Tr. 18). Plaintiff does not allege error in the ALJ's rejection

23

of Dr. Ladd's assessment on the basis of its proximity to his hip surgery; the ALJ had earlier recognized (in relation to plaintiff's left hip) that it was "[r]easonably expected the claimant was weak, stiff and experiencing some pain [some six weeks] after surgery, with his left leg limiting activities of daily living, mobility, and self-care." (Tr. 17) However, plaintiff rightly objects to the ALJ's reversal of this logic in adopting the summary remarks of a nurse, which were included in her description of plaintiff's "Psychosocial" presentation and may well have been nothing more than a boilerplate insertion, since plaintiff was admitted to the medical center and this nurse's care for evaluation of chest pain and right leg cramps (Tr. 279-80), rather than any complaint which would implicate psychosocial considerations.[11]  As plaintiff argues in his brief, it defies credulity to suggest that plaintiff could independently ambulate and perform activities of daily living fifteen days after having a total hip replacement.

Indeed, plaintiff continued to use a walker at the time of his hearing, some four months after his right hip replacement. Plaintiff testified that his right hip replacement had not

_____

[11]The entire entry under the "Psychosocial" domain of this treatment note is as follows: "Patient demonstrates normal behavior appropriate for age and situation.  The patient has adequate support systems available, is able to ambulate independently, and can perform all activities of daily living without assistance.  Patient's nutritional status appears normal.  There are no known religious or cultural beliefs that could impact the care received.  The patient demonstrates the ability and willingness to learn."

24

produced the relatively good results which were achieved on the
left, but had in fact resulted in worse pain, and that he wished
he had not had the surgery on the right (Tr. 469-72). Moreover,
he testified that his pain required that he constantly shift
positions, despite taking strong pain medication in the form of
Duragesic and Lidoderm skin patches, Tramadol, and Lortab (Tr.
123, 471-72).[12] Some need to change positions was implicitly
recognized by the ALJ, to the extent that he found plaintiff
capable of sitting for only six out of eight hours, and walking
for two out of eight hours. While the VE was able to identify
light and sedentary jobs which would allow for that flexibility,
the VE also testified that the availability of these jobs would
be compromised if plaintiff's use of his hands was restricted by
the need to use a walker or other device to support himself while
standing (Tr. 480). Despite plaintiff's testimony, appearance at
the hearing with a walker (Tr. 460), and the significant pain
medication he was prescribed, the ALJ disbelieved the alleged

---

[12]Duragesic patches adhere to the skin and continuously release fentanyl
(a narcotic analgesic) into the blood stream. These patches are prescribed
for the relief of constant pain that is moderate to severe.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601202.html.

    Lidoderm patches adhere to the skin and continuously release the local
anesthetic lidocaine to the region where the patch is located.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a603026.html.

    Tramadol is an opium-based drug used to relieve moderate to moderately
severe pain.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695011.html.

    Lortab is a combination of acetaminophen and hydrocodone (a narcotic
derived from codeine) used to relieve moderate to moderately severe pain.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601006.html.

need for an assistive device and other of plaintiff's subjective complaints, based almost exclusively on the previously discussed report of an emergency room nurse. Therefore, despite nominally invoking "the guidelines set forth in the Social Security Regulations at 20 CFR 404.1529" (Tr. 17-18), the ALJ failed to apply those guidelines meaningfully in consideration of plaintiff's pain allegations vis-à-vis his daily activities, measures taken to relieve the pain, and other such factors.  See Felisky v. Bowen, 35 F.3d 1027, 1038-41 (6th Cir. 1994).

Accordingly, it is the conclusion of the undersigned that reversal of the Commissioner's decision is required, with remand for further administrative proceedings to include updating the medical record and rehearing the matter.


IV.  RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be GRANTED, and that the decision of the Commissioner be REVERSED and the cause REMANDED for further administrative proceedings consistent with this report.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in

which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 23rd day of May, 2007.

 s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE

27